IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

─────────────────────

No. 00-51241

─────────────────────

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                      versus

GARY M GREEN,
also known as Gary Macklyn Green,

                                        Defendant-Appellant.

─────────────────────

Appeal from the United States District Court
for the Western District of Texas

─────────────────────

November 9, 2001

Before REAVLEY, HIGGINBOTHAM, and PARKER, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

     Gary M. Green appeals his conviction following a jury trial on a charge of felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). While in custody, Green responded to *Miranda* warnings with unambiguous requests for his lawyer. Investigators nonetheless then asked Green to open the combination lock of a gun safe and locate other stored guns in his home. We find that Green's compliance was testimonial evidence obtained in violation of Green's Fifth Amendment right to counsel

and its admission at trial requires that we reverse his conviction and remand for a new trial.

I.

Gary M. Green was convicted in the Western District of Texas in 1988 of conspiracy to possess multiple unregistered machine guns in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 371. On February 25, 2000, based on a tip from a first-time confidential informant and follow-up investigation and surveillance, Agent Jim Brigance of the Bureau of Alcohol, Tobacco, and Firearms obtained a search warrant authorizing a search of Green's person, his residence at 117 Royal Oaks Street, Kerrville, Texas, and his green 1999 Ford F-250 pick-up truck for evidence of Green's possession of firearms in violation of 18 U.S.C. § 922(g)(1).

Agent Brigance oversaw the execution of the search warrant on February 29, 2000. He was assisted by six ATF agents and several officers from the Texas Attorney General's Office and the Kerr County Sheriff's Office. The agents detained Green at the Kerrville Post Office. Responding to a *Miranda* warning, Green asked to contact his lawyer. The agents did not allow Green to call his lawyer at that time, but searched Green and his truck. The agents then placed him in a patrol car and transported him to his residence.

Agent Brigance waited at Green's residence for Green and the agents. Upon arriving, Agent Larry Swisher told Brigance that

2

Green had been advised of his *Miranda* rights and that he asked to speak to a lawyer. Agent Brigance then identified himself to Green and told him about the search warrant. Green was given another *Miranda* warning and again responded that he wanted to call his lawyer. Agent Brigance told Green that he could do that later. Agent Brigance testified at the suppression hearing that Green was not free to leave at any point after he was approached at the post office.

As the search of the residence began, Green told Agent Brigance that no one else was home. Agent Brigance asked Green whether there were any weapons in the house or any public safety hazards that could harm anyone, and Green replied that there were several firearms. Following a security sweep of the residence, Agent Brigance asked Green to point out the firearms. Green took Agent Brigance to a bedroom closet which contained a locked metal briefcase. At Agent Brigance's request, Green unlocked the combination lock on the briefcase. Three firearms were recovered from the briefcase: a Taurus nine-millimeter handgun, a Fabrica Militar de Armas Portatiles nine-millimeter handgun, and a Sig Sauer .45-caliber handgun, all later charged in Green's indictment. Green then told Agent Brigance that there was a shotgun in a gun safe in another room. Green and Agent Brigance entered that room, where Green opened the combination lock on the safe. The safe contained a Winchester twelve-gauge shotgun, also charged in

Green's indictment.  At the suppression hearing, Agent Brigance admitted that Green was not free to leave at this point but maintained that Green had not yet been "arrested."

On April 5, 2000, Green was indicted on a charge of felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Green filed a pretrial motion seeking an order suppressing the evidence obtained during the execution of the search warrant and the statements and testimonial acts elicited from him during the search in violation of his Fifth Amendment right to counsel.  Following a pretrial suppression hearing, the district court granted the motion to suppress any oral statements made by Green during the execution of the search warrant.  The court found that Green had clearly asked for a lawyer and that he was not free to leave.  The court also stated, "This does not apply to the guns or the narcotics found by search warrant, that's something else."  The court therefore did not suppress the physical evidence obtained during the execution of the search warrant.

Defense counsel filed an *in limine* motion seeking an order excluding the admission of evidence regarding Green's opening the locked briefcase and safe and disclosing their locations.  The district court reserved ruling on the motion and asked counsel to approach the bench before any inquiry about those events at trial.

Before Agent Brigance took the stand in the government's case-in-chief, defense counsel reurged his objection to the admission of

4

evidence of Green's conduct in unlocking the briefcase and safe. The government argued that defense counsel had left a false impression with the jury by asserting during his opening statement that there was no evidence that Green had entered the closet where the firearms were found, when Green had the combination to the briefcase in the closet. The district court overruled defense counsel's objection and allowed the government to introduce the evidence.

Agent Brigance then testified that, during the search of Green's residence, a Winchester shotgun was found in a gun safe in the corner of one room, that Green knew the combination to the safe by memory, and that Green opened the safe's combination lock. Agent Brigance also testified that several firearms were found in a metal briefcase, that the briefcase was locked with a dial combination lock, and that Green opened the lock for him.

The government made substantial use of this evidence. During the government's closing, Assistant United States Attorney Joey Contreras argued:

> And what else did you hear? Well, there was a safe there, a gun safe. Entry couldn't be made into that safe, but for one person who knew the combination to that safe. Who was that person? The defendant, the convicted felon, Gary Green.
> It doesn't stop there. We have three other firearms. Where are they? They are in a locked briefcase. How are they able to get into that briefcase? Only one person had--opens that briefcase, has the combination, that is the defendant, convicted felon Gary Green.
> . . . .

5

The bottom line is, those guns were in his house, his safe, the briefcase to which he had the combination.

Assistant United States Attorney Karen Norris then argued in the government's rebuttal argument:

And he is saying that because he wants you to think Gary Green didn't have knowledge that the firearms were in the house. Ladies and gentlemen, that's absurd.

There were thousands of rounds of ammunition scattered through the house. Gary Green opened the safe, the gun safe in the video room, where the shotgun was located. And Gary Green opened the case in the closet of the spare bedroom, his father's old bedroom, where the other guns were located. It is absurd--absurd to suggest that Gary Green didn't know there were guns in that house.

. . . .

It is undisputed in this case, and the evidence is clear, that this defendant had the ability to exercise dominion over those guns. He had the combination to the safe. The guns were in his house. Nobody ever disputed that this was his house. He had lived in that house for 20 years, first with his father and then with a string of other people. But it was his house. And he had that combination. He had the power, the ability, to exercise control over those firearms.

. . . .

Ladies and gentlemen, this is a simple case. The ATF agents got a search warrant to look for firearms at 117 Royal Oak. And they went out there on February 29th, and they went into the house, and they found firearms. They found four of them; three in a locked briefcase, which the defendant opened, one in a locked safe, which the defendant opened.

On August 23, 2000, the jury found Green guilty. Green was sentenced to 18 months imprisonment and three years supervised release. Green has timely appealed his conviction.

II.

In reviewing the denial of the defendant's motion to suppress, we review the district court's factual findings for clear error and

6

its legal conclusions *de novo*.[1] "We view the evidence in the light most favorable to the party that prevailed in the district court."[2] When reviewing the district court's denial of the defendant's motion to suppress, we may consider the evidence admitted at both the suppression hearing and the trial.[3]

A.

Green argues that the district court erred in denying his motion to suppress evidence of his disclosure of the location of two locked cases containing firearms and his unlocking the combination locks on these cases after he had been given a *Miranda* warning and had repeatedly requested counsel. We agree.

"The Fifth Amendment right to counsel arises when, as here, an individual is subject to custodial interrogation."[4] The government does not dispute that Green was in custody when he identified the briefcase and safe and unlocked the combination locks on each, after having been transported by ATF agents to his residence and led around in the execution of the search warrant.[5] The government

---

[1] *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001).

[2] *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001).

[3] *United States v. Jones*, 239 F.3d 716, 718 (5th Cir.), *cert. denied*, 122 S. Ct. 142 (2001)

[4] *United States v. Cruz*, 22 F.3d 96, 98 n.7 (5th Cir. 1994).

[5] *See United States v. Gonzales*, 121 F.3d 928, 939 n.6 (5th Cir. 1997) (discussing the "custodial" requirement).

also does not dispute, although it does not explicitly concede the point, that the ATF agents' actions in taking Green to his residence and telling him to assist the agents in executing the search warrant and show them any firearms in the residence was interrogation likely to elicit an incriminating response.[6] Green's actions in disclosing that there were firearms in the residence, showing the agents where the firearms were located, and opening the briefcase and safe were all made in response to queries from ATF agents after he had invoked his right to counsel.  This was custodial interrogation.

Once a suspect who is in custody has been informed of his right to counsel through a *Miranda* warning and has requested counsel, law enforcement officers may not further question the suspect, and, absent his knowing and voluntary waiver of his right to counsel, any statements or testimonial acts elicited by law enforcement officers are inadmissible.[7]  The government makes no argument that Green did not clearly and unambiguously invoke his right to counsel, because he did, or that he waived his right to

---

[6] *See United States v. Daughenbaugh*, 49 F.3d 171, 174 (5th Cir. 1995) (discussing the "interrogation" requirement); *United States v. Dougall*, 919 F.2d 932, 935 (5th Cir. 1990) (same).

[7] *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Muniz v. Johnson*, 132 F.3d 214, 218 (5th Cir. 1998); *United States v. Broussard*, 80 F.3d 1025, 1035 (5th Cir. 1996); *Bradford v. Whitley*, 953 F.2d 1008, 1010 (5th Cir. 1992).

counsel or voluntarily initiated communication with the ATF agents, because he did not.[8]

On appeal, the government mentions its argument made before the district court that, although Green's oral statements may have been elicited during custodial interrogation in violation of his Fifth Amendment right to counsel, Green's acts of opening the combination locks were non-testimonial. This argument is without merit. Supreme Court precedent forecloses any argument that Green's directing the agents to the two cases containing firearms and opening the combination locks were not testimonial acts.

In *Doe v. United States*,[9] the majority implicitly held that this precise behavior was testimonial communication so expressing

---

[8] *See United States v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998) (holding that the right to counsel must be unambiguously invoked by a suspect); *Muniz*, 132 F.3d at 218 (holding that a suspect is not subject to further interrogation by law enforcement officers until counsel has been made available to him unless the suspect himself initiates further communication, exchanges, or conversations with the officers); *Bradford*, 953 F.2d at 1010 (holding that a valid waiver of the Fifth Amendment right to counsel cannot be established by showing only that the suspect responded to further law-enforcement-initiated interrogation even if he had been advised of his rights); *Davis v. Puckett*, 857 F.2d 1035, 1037 (5th Cir. 1988) (holding that, after a suspect invoked his right to counsel, subsequent statements are admissible only if the suspect initiated further discussion with the police and knowingly and intelligently waived the right he had invoked).

[9] 487 U.S. 201 (1988).

the defendant's mind as to constitute compelled self-incriminatory statements.[10]  There is no serious question but that Green's actions in disclosing the locations and opening the combination locks of the cases containing firearms were testimonial and communicative in nature.[11]  These compelled acts disclosed Green's knowledge of the presence of firearms in these cases and of the means of opening these cases.[12]  The ATF agents elicited these testimonial acts in violation of Green's Fifth Amendment right to counsel, and their admission at trial was reversible error.

B.

The government argues that any violation of Green's rights under the rule established in *Edwards v. Arizona*[13] was either invited error or harmless constitutional error.  The doctrine of

---

[10]  *Id.* at 210 n.9 (making a comparison between being compelled to surrender a key to a strongbox containing incriminating documents, which would not be a testimonial act, and being compelled to reveal the combination to a wall safe, which would be a testimonial act).

[11]  *See Penn. v. Muniz*, 496 U.S. 582, 594-95 (1990); *see also Schmerber v. Cal.*, 384 U.S. 757, 761-65 (1966) (discussing the meaning of "testimonial" and "communicative" for purposes of Fifth Amendment protections); *United States v. Brown*, 920 F.2d 1212, 1215 (5th Cir. 1991) (listing applications of the rule that the Fifth Amendment applies only to evidence that is testimonial and communicative in nature, and not to evidence that is demonstrative, physical, or real).

[12]  *See Muniz*, 496 U.S. at 595 n.9 (noting that "nonverbal conduct contains a testimonial component whenever the conduct reflects the actor's communication of his thoughts to another").

[13]  451 U.S. 477 (1981).

invited error provides that "when injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such 'invited error.'"[14]  Under this doctrine, a defendant cannot complain on appeal of alleged errors which he invited or induced, especially where the defendant may not have been prejudiced by the error.[15]  We "will not reverse on the basis of invited error, absent manifest injustice."[16]

The government argues that Green opened the door to admission of the evidence of his disclosing the location of the firearms and opening the combination locks on the cases containing the firearms when, during his opening statement, defense counsel argued that the government had no evidence that Green "ever entered the closet where the guns were found" or "did anything, other than live in that house."  The government contends that, if Green knew the combination to the briefcase, which was found in the closet, it is reasonable to infer that Green had been in the closet, had opened the briefcase, and knew about the firearms.  The government also argues that the assertion in defense counsel's opening statement that the government had no evidence that Green did anything other

---

[14]  *United States v. Raymer*, 876 F.2d 383, 388 (5th Cir. 1989).

[15]  *Id.*

[16]  *United States v. Pankhurst*, 118 F.3d 345, 359 (5th Cir. 1997); *see also United States v. Lemaire*, 712 F.2d 944, 949 (5th Cir. 1983) ("[Invited error] would remove the matter from being error requiring reversal, unless the error was so patent as to have seriously jeopardized the rights of the appellant.").

than live in the residence was countered by the reasonable inferences that, because Green knew of the combinations to the locks on the briefcase and safe, he knew of the firearms.

This argument would have no purchase if defense counsel had explicitly used the word "admissible" in stating that the government had no evidence, an argument that no competent counsel would make. Such a statement aside, the contention is that, because defense counsel challenged whether the government had *any* evidence, the door was opened to evidence obtained in violation of Green's Fifth Amendment right to counsel. This argument lacks record support, and we reject it.

It is the admission of improper *evidence*, not just *arguments*, of which Green complains,[17] and here the evidence was not admitted for impeachment purposes only, but rather as evidence of Green's guilt in the government's case-in-chief.[18] Moreover, this is not a case where defense counsel opened the door by questioning the defendant on a subject relating to inadmissible evidence.[19]

---

[17] *Compare United States v. Rodrigo*, 934 F.2d 595, 597-98 (5th Cir. 1991).

[18] *Compare United States v. Grubbs*, 776 F.2d 1281, 1286-87 (5th Cir. 1985).

[19] *See Raymer*, 876 F.2d at 388 (finding invited error where defense counsel first inquired on direct examination about statements made by the defendant to his psychologist, after which the prosecutor asked two questions on the subject which went largely unanswered and the prosecutor did not touch on the subject again); *United States v. Meneses-Davila*, 580 F.2d 888, 895 & n.14 (5th Cir. 1978) (finding invited error where defense counsel first

The government's reliance on *United States v. Casto*[20] is misplaced. In *Casto*, defense counsel suggested in his opening statement that he might attack the credibility of a government witness if she were put on the stand.[21] We held that it was permissible for the government to anticipate the cross-examination, noting that the witness's guilty plea did not implicate the defendant or confirm or deny his guilt.[22] Here, Green's testimonial conduct implicated his guilt, as evidenced by the government's use of the evidence.

We find more help in our decision in *United States v. Acosta*.[23] In *Acosta*, defense counsel announced in his defense opening statement that he would put the defendant on the stand and that "'I want to give the U.S. Attorney an opportunity to delve into his background and to present to you anything that they may like to present to you that would reflect adversely upon him.'"[24] The district court allowed the prosecutor to admit a remote prior

---

elicited evidence regarding otherwise inadmissible post-arrest silence); *United States v. Doran*, 564 F.2d 1176, 1177 (5th Cir. 1977) (finding invited error where defense counsel first elicited evidence regarding otherwise inadmissible plea negotiations).

[20] 889 F.2d 562 (5th Cir. 1989).

[21] *Id.* at 567.

[22] *Id.* at 567-68.

[23] 763 F.2d 671 (5th Cir. 1985).

[24] *Id.* at 694 n.28.

13

conviction over defense counsel's objection under Federal Rule of Evidence 609(b) because the district court held that the word "anything" in the defense opening statement constituted "a waiver of [the defendant's] right to object to potentially inadmissible evidence or otherwise suspended the operation of the rules of evidence."[25] The trial court explained, using reasoning very similar to that underpinning the government's argument here:

> "Because I think when counsel invites the Government to bring up anything, uses the word anything, I think they have the right to do it. I think you are not being fair with the jury when you tell them that you are going to let the Government go into anything and that you are really not, counsel. If you had qualified it, said anything that the law will allow him to do. But there is no qualification, they just think Mr. Arney had been teaching Sunday School all his life, and that is not quite correct."[26]

We rejected this reasoning, noting that "the use of the word 'anything' by counsel during opening argument did not bar [the defendant] from objecting to the admission of his remote conviction and [the defendant] did effectively object when the government notified the court that it would seek to elicit this evidence on cross-examination."[27]

Similarly, Green did not open the door to the admission of inadmissible evidence against him and did not create a false impression by challenging whether the government had any evidence

---

[25] *Id.* at 694.

[26] *Id.*

[27] *Id.* (footnote omitted).

14

to satisfy the knowing possession element of the section 922(g)(1) charge against him. Although the government points to defense counsel's statements in his opening regarding whether the government had "any evidence," these statements must be read within the context of the entire opening. Defense counsel prefaced his statements no less than ten times by the usual qualifying language of opening statements that he believed or suspected "the evidence is going to show," or that he thought "there's going to be evidence" of, various facts. He also concluded his opening statement by saying that "[t]hat's the case that I think the government is going to bring to you." And the government made no complaint at the time about the argument. It remained silent until later in the trial when it decided it wanted to elicit the disputed evidence.

In the context of defense counsel's opening statement, fairly read, "any evidence" means "any *admissible* evidence." At the time of the opening statement, the district court had suppressed Green's oral statements elicited after his rejected request for counsel and reserved ruling on the requested exclusion of Green's testimonial acts in disclosing the location of the firearms in the locked cases and opening the locks on those cases. Although the district court therefore had not yet ruled whether the testimonial conduct was admissible, defense counsel's statement that the government did not have any evidence showing knowing possession did not, by itself,

render incompetent evidence admissible.  The inescapable fact is that the government would not have had this evidence had the *in limine* objection been properly sustained at trial.  The argument in the defense closing would then have been that "the government has brought you no evidence that . . ." or "there was no evidence in the record . . ." or "the government has no evidence that . . .."

By challenging whether the government had any admissible evidence of his guilty knowledge Green did not automatically make admissible any facts, conduct, or statements that the district court had not yet explicitly ruled inadmissible.  To hold otherwise would stretch the doctrine of invited error too far.

### C.

The government argues that, if the error was not invited, the error was nevertheless harmless because the evidence of Green's guilt was overwhelming even without the questioned evidence of Green's disclosing the location of, and opening the combination locks on, the briefcase and safe containing the firearms.  The erroneous admission of evidence of testimonial acts elicited in violation of a suspect's Fifth Amendment right to counsel is subject to the doctrine of harmless constitutional error.[28]

Under a harmless constitutional error analysis, we must review the record to determine whether the error was harmless beyond a

---

[28]  *Goodwin v. Johnson*, 132 F.3d 162, 181 (5th Cir. 1997).

16

reasonable doubt.[29]  "An error is harmless only if we can determine beyond a reasonable doubt that the improper testimony did not contribute to the jury's verdict."[30]  We must consider what effect the error had upon the guilty verdict in the instant case, not the effect the constitutional error might generally be expected to have upon a hypothetical reasonable jury.[31]  The question is whether the evidence prejudicially contributed to the conviction,[32] *i.e.*, whether, looking to the basis on which this jury rested its verdict, the verdict rendered was surely unattributable to the constitutional error.[33]

We have noted that a consideration relevant to whether a guilty verdict was "surely unattributable" to the constitutional error is the degree of importance placed on the erroneously admitted evidence by the prosecution in presenting and arguing its case to the jury, such that "[t]he emphasis, or lack thereof, placed on the [evidence] by the prosecution can affect the perception of that [evidence] by the jurors."[34]  As Green

---

[29]  *See United States v. Moreno*, 185 F.3d 465, 472 (5th Cir. 1999).

[30]  *Id.* at 475.

[31]  *United States v. Lage*, 183 F.3d 374, 388 (5th Cir. 1999).

[32]  *United States v. Nutall*, 180 F.3d 182, 188 (5th Cir. 1999).

[33]  *United States v. Walker*, 148 F.3d 518, 526 (5th Cir. 1998).

[34]  *Id.* at 527.

persuasively argues, the erroneously admitted evidence was important in the government's proof of Green's knowing possession of the firearms, an element of its case. Green's knowledge of the location of the firearms and the combinations to the locks on the briefcase and safe was emphasized repeatedly in the government's closing arguments and in the questioning of the ATF agent from whom it was elicited.

We find that the evidence of ammunition scattered throughout the residence and the evidence that Green may have entered the rooms in which the firearms were located does not establish that the constitutional error in this case was harmless beyond a reasonable doubt. Green's knowledge of the location of the firearms in the locked cases and of the combination of the locks on those cases was the only direct evidence of his knowledge of and access to the firearms charged in the indictment.[35] Given this fact, coupled with the evidence at trial that other people who may have possessed firearms had resided in Green's house, it cannot be said that the error in this case was harmless beyond a reasonable doubt.

III.

_____

[35] We also recognize that a shotgun barrel was recovered from Green's truck, which could be used to replace the barrel on the shotgun recovered from the gun safe in Green's house. This evidence, however, also does not alter our conclusion that the constitutional error in this case was not harmless beyond a reasonable doubt.

18

Because we find the district court committed reversible error in denying Green's motion to suppress his testimonial conduct, we need not reach Green's other points of error.  We REVERSE Green's conviction and REMAND for a new trial.